JOSEPH B. MORSE *vs.* WILLIAM STOCKER & others.

*St.* 1853, *c.* 315, which imposes upon owners of lots abutting on any street or way which then was or thereafter should be opened over any private land by the owners thereof, and dedicated to or permitted to be used by the public before being accepted and laid out according to law, the duty of grading such street or way at their own expense, in such manner as the safety and convenience of the public shall, in the opinion of the mayor and aldermen of the city, or selectmen of the town, require; and which authorizes the mayor and aldermen, or selectmen, to cause the same to be so graded, and to assess the expenses thereof upon the owners of such abutting lots, and to create by such assessment a lien upon their respective lands, if upon notice they refuse or neglect to grade the same in manner aforesaid, or to close the same from public use, is unconstitutional and void.

HOAR, J. This case presents an extremely interesting and important question, in which the powers and duties of municipal corporations, and the protection which the constitution affords to the rights and property of private citizens, are largely involved. Upon the facts admitted or proved at the hearing, it appeared that a way called Webster Street was laid out over private land in Charlestown, about twenty years ago, by the owner of the land, extending from Bunker Hill Street to Medford Street, the two latter being public streets or highways: that lots for building were sold to different persons on both sides of Webster Street, some of them bounded on the middle of the street, and with a right of way through its whole length annexed to each of the lots; and that dwelling-houses and other buildings have been from time to time erected upon these lots by the grantees respectively. It further appeared that opening out of Webster Street, at a point about half way from Bunker Hill Street to Medford Street, was a court called Hill's Court, on which some houses were erected; that Webster Street had not been dedicated to the public as a public street, and that the public had not been permitted, in consequence of some obstructions in the street, to use it in its whole length, but that the public had for many years been permitted to use that part of it between Bunker Hill Street and Hill's Court. The mayor and aldermen of Charlestown, under the authority of the *St.* of

1853, c. 315, passed an order fixing the grade of Webster Street, and declaring that, in their opinion, the safety and convenience of the public required that it should be graded in conformity therewith; gave notice of this determination to the owners of lots abutting upon the street; and the owners of such lots having neglected to grade the same accordingly, or to close the street from public use, the mayor and aldermen were proceeding to cause the street to be so graded, with the intention to assess the expense of the work upon the abutters, as the statute directs, when they were restrained from further proceeding by the injunction of this court. The plaintiff in this suit, who obtained the injunction and seeks to make it perpetual, is the owner of a lot of land, with a dwelling-house upon it, abutting upon Webster Street, near Bunker Hill Street, and bounded by the middle of Webster Street. The grade established by the mayor and aldermen requires the street to be cut down in front of his dwelling-house to the depth of eight and a half feet, and renders the access to it inconvenient and difficult.

The *St.* of 1853, c. 315, under which the defendants justify their acts, is as follows :

" SECT. 1. When any street or way which now is or hereafter shall be opened, in any city or town which shall accept this act as hereinafter provided, over any private land, by the owners thereof, and dedicated to or permitted to be used by the public before such street or way shall have been accepted and laid out according to law, it shall be the duty of the owners of the lots abutting thereon to grade such street or way at their own expense, in such manner as the safety and convenience of the public shall, in the opinion of the mayor and aldermen of any city or selectmen of any town, require ; and if the owners of such abutting lots shall, after reasonable notice given by the said mayor and aldermen, or selectmen, neglect or refuse to grade such street or way in manner aforesaid, or to close the same from public use, it shall be lawful for the said mayor and aldermen, or selectmen, to cause the same to be graded as aforesaid, and the expense thereof shall, after due notice to the parties interested, be equitably assessed upon the owners of such abut-

ting lots by the said mayor and aldermen, or selectmen, in such proportions as they shall judge reasonable; and all assessments so made shall be a lien upon such abutting lands, in the same manner as taxes are now a lien upon real estate; *provided always*, that nothing contained in this act shall be construed to affect any agreements heretofore made, respecting any such streets or ways as aforesaid, between such owners and any city or town; *provided also*, that any such grading of any street or way by the mayor and aldermen, or selectmen, as aforesaid shall not be construed to be an acceptance of such street or way by any such city or town; and that the said grading of such street or way by any such owners, or on such notice or procurement of such mayor and aldermen, or selectmen, shall not be construed to be a dedication to the public use of any such street or way, or any part thereof, by the owner or owners of the same."

The second section provides for establishing the grade of any such street or way, with reference to future improvements, before the same shall be actually graded, and is not material to the question under consideration.

The third section provides that " no street or way mentioned in the first and second sections of this act shall be dug up, or in any way obstructed in any part thereof, without the consent of the mayor and aldermen of the city, or the selectmen of the town, in which such street or way is situated."

The power of the legislature over private property, under the constitution, is certainly not absolute, and must be exercised under limitations which have been carefully guarded and defined; and it is one of the gravest duties of this court to determine, in any case presented for its decision, whether those limitations have been exceeded. And it is important, in order to ascertain the full effect of this statute, and to see what objects the legislature proposed to accomplish by its enactment, to examine carefully, in the first place, what rights the public already had in the streets or ways to which the statute applies; and then to consider whether any additional rights could be thus acquired or exercised.

The question whether a highway could be established in this commonwealth by dedication, was first decided in the affirmative, by a majority of this court, in the case of *Hobbs* v. *Lowell,* 19 Pick. 405.   But whether such dedication would be effectual without the assent of the public, and if that assent were required how it should be manifested or withheld, it did not then become necessary to determine, because the proof of an assent by the public authorities in that case was abundant and conclusive.

In *Larned* v. *Larned,* 11 Met. 421, it is said by Hubbard, J., that " though it was formerly doubted by learned judges whether a way was ever made by dedication in this commonwealth, yet it is now definitively settled that a way may be established by dedication of the owner of the soil, with the assent of those who are interested in the way.   And this is true not only of a highway, but of a town way or private way."

Afterward, in the year 1849, the question of the necessity of the assent of the city or town in which a way is situated, in order to establish it as a public way by dedication, was more fully considered in the case of *Bowers* v. *Suffolk Manufacturing Co.* 4 Cush. 332.   And it was said by the court, that in the case of *Hobbs* v. *Lowell* " it seems to be clearly intimated, that, if it had been necessary to decide the question, it would have been decided that, without the acquiescence of the town in which the way was laid out, the way would not have been considered as a public way "; and that the court were " strongly inclined to the opinion that, whatever may be the law in England, in this commonwealth no public way can be established by dedication merely, and without the assent, express or implied, of the city or town bound by law to keep it in repair."   The court say further, that " if there were any doubts on this point previous to the *St.* of 1846, *c.* 203, they must be removed by that statute. The statute provides, that no way heretofore opened and dedicated to the public use, and not already become a public way, shall become chargeable upon any city or town of this commonwealth, unless such way shall be laid out and established by the city or town, in the manner prescribed by the statutes of

this commonwealth." It was argued for the defendants, that the exemption of the city from the charge of maintaining the way was not inconsistent with the right of the public to use the way, and the duty of the land-owner to refrain from obstructing it. But it was answered by the court, that this was only true in part; that the land-owner might not be entitled to maintain trespass against any one who might pass over it while it remained open; but he might shut up the way, and the right of passing over it would thereby be terminated; the opening of the street amounting to a license, but not to a grant or dedication. See also *Valentine* v. *Boston*, 22 Pick. 75; *Commonwealth* v. *Fisk*, 8 Met. 245.

In *Hemphill* v. *Boston*, 8 Cush. 195, it was held that he who gives his land to the public may prescribe the terms and limitations on which he gives it; and if it be accepted at all, it must be accepted with the limitations, qualifications and restrictions prescribed. Thus, if it be given for a special and limited use and purpose, as for a footway, it must be accepted and held for that use only; or it must fail altogether, and then no public right is established by the gift.

From these decisions, we think the state of the law, when the statute of 1853 was passed, was clearly this : — no way or street could be made a public way by merely throwing it open to the public, or permitting the public to use it, without the assent of the public authorities, and its acceptance as a street by them; and this assent and acceptance, after the statute of 1846, could only be given by laying out the street according to the ordinary mode prescribed by law; and any throwing open of a way to the public, or permitting the public to use it, would only amount to a license by the owner, which would afford a justification to all persons who should avail themselves of it, so that they would not be trespassers while it continued, but revocable at his pleasure.

In looking for the intent of the legislature in the statute of 1853, it is proper, in the next place, to consider the provisions of law which were then in force, in relation to a change of grade in existing public ways. In *Callender* v. *Marsh*, 1 Pick. 418, it was

decided that the public had the right to dig down and reduce the level of a highway, in order to make it more safe and convenient for travel, without making any compensation to proprietors of lands adjoining the way, although the effect of it might be incidentally injurious to them, by rendering the access to their land or buildings inconvenient, or by endangering buildings which had been erected on the line of the highway. It was there said that, the streets being public property, the value of the land taken must either have been paid for or given to the public at the time the street was established; and that the chance of possible future damage by a change in the grade of a street was a matter to be taken into account when the street was first laid out. But the law was altered in this respect by the Rev. Sts. *c.* 25, § 6, which provided for compensation to the owner of land adjoining a highway or town way, who should sustain any damage in his property by reason of any raising, lowering, or other act done for the purpose of repairing such way. And it seems very reasonable to suppose that substantial justice was promoted by this change in the law; that, however it might be in theory, practically there would, in most cases, be no allowance at the time a way was laid out for such a remote contingency as a future change of grade; and that the large expense which such a change might sometimes occasion to the owners of buildings fronting on the highway ought not to be borne exclusively by them especially when they might have erected their buildings in reference to a condition of the way adopted or established by the public authorities, and apparently intended to be permanent.

By the statute of 1853 the legislature seem to us to have contemplated a provision for another class of cases. It was found that streets were laid open in towns and cities through lands which were prepared for building lots, which it was probable the public convenience and necessity would at some future time require to be laid out and established as public ways or streets. If the grade of these streets were not such as was adapted to the public safety and convenience, it would obviously be for the public interest that they should be made upon a proper grade at

first, and not that expensive buildings should be erected by the abutters, which would occasion a very great expense to the town or city when a change should be necessary after they had become public property. If means could be found to accomplish this object, within the constitutional powers of the legislature and consistent with a due regard to individual rights, the object itself is legitimate and desirable. But, upon such full and careful consideration as the importance of the duty devolved upon us demands, and with a full sense of the responsibility resting upon this court when called upon to determine the validity of a statute passed by the legislature under the forms of law, we are all of opinion that this statute can furnish no authority for the acts which the mayor and aldermen of Charlestown have undertaken by virtue of it, because the statute is in itself repugnant to the constitution, and is not within the competency of legislative power.

The statute imposes the duty upon owners of the lots abutting upon any street or way which then was or thereafter should be opened over any private land by the owners thereof, and dedicated to or permitted to be used by the public before it should be accepted and laid out according to law, to grade the same at their own expense in such manner as the safety and convenience of the public should, in the opinion of the mayor and aldermen of the city, or selectmen of the town, require. If, upon notice, the abutters refuse or neglect to grade such street or way in manner aforesaid, or to close the same from public use, then the mayor and aldermen, or selectmen, may cause the same to be so graded, assess the expense upon the abutters, and create by such assessment a lien upon their respective lands.

The legislature thus undertakes to deal with private property. It is " private land " over which its owners have established a way. The owners have an undoubted right to use their land for a way. It is a lawful use of their own property, beneficial to themselves, and not injurious to others. Permitting the public to use it does not make it public property. It is, as we have seen, a mere license, revocable at pleasure. The word " dedicated " can be understood to mean nothing more than the phrase

which follows, "permitted to be used by the public," because the statute itself negatives the idea that the street has become a public street by any acceptance or lawful laying out as a public way, and expressly provides that nothing done by virtue of it shall be construed to be an acceptance or dedication.  And it is worthy of notice, in this connection, that in the recent careful revision of the statutes, the words "dedicated to" have been stricken out, apparently as superfluous and tautological, and the words "permitted to be used by the public" alone retained. Gen. Sts. *c.* 43, § 84.  What right, then, have the abutters to raise or lower the grade of the way ?  They do not necessarily own it.  In many cases they do not own the fee, and have only an easement.  In some cases an abutter has no interest or right in it whatever.  The owner of land may lay out a way on one side of his own land, and the owner of the land adjoining on the other side have no easement in it, or duty or obligation respect-ing it.  But if the owners of lots abutting on the way have rights in the way, what power have they to close it from public travel ?  How could the plaintiff in the case before us, although he owns the fee of the land to the centre of the way, and has a right of passage through its whole extent, erect any barrier to close it ?  He has no right to do anything on that part of the land covered by the way which he does not own, except to use it as a way and perhaps to repair it.  On that part which he does own he has no right to obstruct the passage of others who have purchased or reserved a right of way.

The first objection to the statute, then, is that, by confounding abutters upon a way with the owners of a way, it requires one person to assume and exercise control over the property of another.

In the second place, is the action of the mayor and aldermen to be regarded as a taking of private property for public use ? It is private property when they enter upon it.  The fee of a part of the street belongs to the plaintiff, and without his consent they enter upon it and dig down and remove the soil to a depth of several feet.  The right of passing over it belonged

exclusively to certain private persons, but the municipal authorities have no title derived from them. The public have been permitted to use it, but it has not become in any sense the property of the public, and the permission may at any time be revoked. The purpose of the mayor and aldermen is to prepare and adapt the way to the public safety and convenience. They are to effectuate this purpose, although it may thereby be made inconvenient and injurious to its proprietors. The third section of the statute provides that it shall not be dug up or obstructed without the consent of the mayor and aldermen. We can see in all this nothing but a substantial appropriation of private property to a public use, within the meaning of the tenth article of the bill of rights; and, as the statute makes no provision for any compensation to the owner of the property, it is in direct conflict with that constitutional requirement.

If the attempt be made, as has been suggested in the argument for the defendants, to support the statute on the ground that it is a police regulation, equal difficulties are encountered. It may be said that no person has a right to open a place for public resort which is not safe, and that the legislature have the right and the duty to secure the public safety. But the objection to this view is twofold. First, the statute does not confine itself to the case of ways which are unsafe, but applies to all which are not graded in such a way as the safety and convenience of the public may require; and they are to be made safe and convenient. Now we know no right which the legislature have to require a citizen to make his property convenient for his neighbor's use without compensation. And, secondly, the way is to be made thus safe and convenient, not at the expense of its owners or of those who may be responsible for its dangerous condition, but of the abutters, without reference to the question whether they have any responsibility, right or duty respecting it.

The requirement that the expense of grading the way shall be assessed upon the owners of lots abutting upon it is obnoxious to criticism, if we consider it as an exercise of the power of taxation. There may undoubtedly be taxes levied for public purposes of a local character which will not be adjudged unconsti

tutional on account of inequality in their operation. Where the assessment is made upon persons in respect of their ownership of a particular species of property, which receives a peculiar benefit from the expenditure of the tax, the tax is valid, although it does not operate upon all persons and property in the community. This was determined, upon very full consideration, in the case of *Goddard, Petitioner,* 16 Pick. 504; which was the case of a by-law of the city of Boston requiring owners or occupants of houses bordering on streets to remove the snow from the sidewalks in front of them. And in *Lowell* v. *Hadley,* 8 Met. 180, the same principle was applied to an ordinance of the city of Lowell which provided for the construction of sidewalks upon streets at the expense of the abutters. So in the legislation respecting the construction of drains and sewers a like doctrine may be found to prevail. But in all these cases the tax is levied for a public object, and the citizen who pays it is supposed to receive an equivalent in the particular accommodation and benefit to his estate which he derives from it; while in the case we are now considering there is no provision that the street or way shall ever be made a public way, or that any use of it shall ever be secured to the person who is compelled to contribute to its construction.

Upon the whole matter we think the statute upon which the defendants rely is not a justification of the acts which the mayor and aldermen of Charlestown were proceeding to do at the time the bill was filed; that their interference with the street and the land of the plaintiff was a nuisance for which he is entitled to relief in equity; and that the injunction granted must be made perpetual.

*J. Q. A. Griffin,* for the plaintiff.

*J. G. Abbott & J. Dana,* for the defendants.